Bell Telephone Company of Pennsylvania, Petitioner v. Workmen's Compensation Appeal Board (DeMay), Respondents.

Bell Telephone Company of Pennsylvania, Petitioner v. Workmen's Compensation Appeal Board (Salsberry), Respondents.

Argued December 13, 1984, to Judges CRAIG and DOYLE and Senior Judge BLATT, sitting as a panel of three.

*Kathleen A. Lenahan,* with her, *John R. Lenahan, Sr., Lenahan & Dempsey, P.C..* for petitioner.

*Quintes D. Taglioli, Markowitz & Richman,* for respondents, DeMay and Salsberry.

OPINION BY JUDGE CRAIG, February 14, 1985:

The Bell Telephone Company of Pennsylvania appeals orders of the Workmen's Compensation Appeal Board in these two similar cases. Although not consolidated for argument, the cases present parallel elements prompting us to dispose of them in this consolidated opinion. In each case, the board affirmed the referee's award of benefits for a psychiatric disability determined to be a compensable injury related to the claimants' employment under section 301(c) of The Pennsylvania Workmen's Compensation Act,[1] 77 P.S. §411. We must determine whether substantial evidence[2] supports the referees' findings of fact relating to causation.

---

[1] Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§1-1066.

[2] Where, as here, the party with the burden of proof prevailed before the referee, and the board has not taken additional evidence, the Commonwealth Court's scope of review is limited to a deter-

Grace DeMay and Duane Salsberry were both employed at different times in 1979 as repair clerks in Bell's Service Center in Washington, Pennsylvania. DeMay had worked as an operator for Bell in Pittsburgh for thirty years before she accepted the position in Washington because it was more convenient to her home. Salsberry had worked for AT&T for twenty-four years, primarily as an installer, when a knee injury prompted the company to transfer him to the repair clerk position. Both completed a one-week training program for the new job which entailed answering phone calls from customers with service or equipment problems, determining the nature of the problem, and telling the customers when they could expect the repair to be completed. With two repair clerks available on each shift to answer such calls, one of them had to answer each incoming call within twenty seconds of the first ring;[3] if the answering pickup was late, a loud buzzer would sound.

DeMay did not perform well at her new job, and frequently required assistance from her co-workers. A supervisor, Christine Flavell, discussed with DeMay some possible approaches to her difficulties with the job, including "retreating" to the operator job DeMay previously held. However, after some additional training, DeMay's work improved and there was no further mention of retreating.

---

mination of whether constitutional rights were violated, an error of law was committed, or any necessary findings of fact are not supported by substantial evidence. *Jones v. Workmen's Compensation Appeal Board*, 25 Pa. Commonwealth Ct. 546, 360 A.2d 821 (1976).

[3] As Bell points out, the referee's finding regarding the buzzer is not clear, and he may have misunderstood the testimony to indicate that repair clerks had to complete, rather than simply answer, all calls within twenty seconds. However, the record contains other evidence which is sufficient to support the referee's conclusion that the service center had a high stress environment.

Nevertheless, DeMay testified, she continued to experience a significant amount of stress, which she attributed to the work environment and what she considered to be harassment by her supervisors. On October 8, 1979, DeMay became very agitated when a supervisor questioned a repair commitment time that DeMay had given to a customer. When DeMay reported for work the next day, she told Supervisor Flavell that she had not slept well and could not work that day. However, DeMay agreed to stay until her replacement arrived, and told Flavell that she wanted to talk to her. DeMay and Flavell did not get together until that afternoon, by which time DeMay was very anxious and asked Flavell for her union representative's phone number. Flavell told DeMay that she would have to wait until her break to make the call. DeMay got very upset and insisted upon making the call then. Flavell gave DeMay the number, but the union representative was not in when DeMay called, and she became extremely agitated. DeMay told Flavell that she had to see a doctor immediately, and left the offfice. DeMay never returned to work.

That afternoon, DeMay saw her family physician, Dr. Tripoli, who prescribed tranquilizers and sleeping pills, and referred her to a mental health clinic. There she saw a psychiatrist, Dr. Borerro, who diagnosed DeMay as a compulsive obsessive person then experiencing agitated depression with high anxiety levels. Dr. Borerro has treated DeMay with various chemicals and psychotherapy with little success.

Similarly, Salsberry was not comfortable in his new job, and felt that he was not performing it satisfactorily. However, the record contains no evidence that his supervisors considered his work unsatisfactory, nor that they ever publicly reprimanded him for poor job performance. Salsberry was also un-

happy because he considered Bell's transfer of him to the repair clerk job, which paid $100 per week less than the installer job, to be an unwarranted demotion.

Salsberry had been on the job for approximately three weeks on March 27, 1979, when he felt he could not answer any more phone calls; he collapsed, experienced a momentary loss of vision, and started to cry. His wife picked him up at the service center and took him home. Salsberry saw his family physician, Dr. Adler, who diagnosed his condition as a depressive reaction to stressful conditions at work. Salsberry later consulted a psychiatrist and a psychologist about his continued depression, and both concurred in Dr. Adler's diagnosis.

At the respective referees' hearings, each claimant introduced the testimony of the same clinical psychologist, Dr. Derogatis, who had conducted a study of the Washington Service Center by interviewing approximately twenty employees. Instances of supervisors harassing and publicly humiliating the employees were frequent complaints in Dr. Derogatis' study. His report concluded that the center represented an extremely high stress environment which resulted in the prevalence of psychiatric disorders. Each of the referees accepted that conclusion.

A nervous disability or mental illness arising in the course of employment and related thereto is a compensable injury within the meaning of section 301(c) of the Act, 77 P.S. §411. *University of Pittsburgh v. Workmen's Compensation Appeal Board,* 49 Pa. Commonwealth Ct. 347, 405 A.2d 1048 (1979). However, because of the highly subjective nature of psychiatric injuries, the claimant must adequately pinpoint the occurrence of the injury and its cause. *Thomas v. Workmen's Compensation Appeal Board,* 55 Pa. Commonwealth Ct. 449, 423 A.2d 784 (1980).

In *McDonough v. Workmen's Compensation Appeal Board,* 80 Pa. Commonwealth Ct. 1, 470 A.2d 1099 (1984), where the employer's constant public criticism caused an employee's gradual mental demise, this court recognized that a longterm process of mental or emotional deterioration may be compensable. However, in *Thomas,* where a refinery worker had a growing fear that a job-site explosion would recur, we held that an employee's mental disability caused by his subjective reaction to normal working conditions is not compensable.

In *Hirschberg v. Workmen's Compensation Appeal Board,* 81 Pa. Commonwealth Ct. 579, 474 A.2d 82 (1984), where we affirmed the board's denial of benefits to a Pennsylvania Department of Transportation employee with a pre-existing neurosis who claimed to be totally disabled by stress from his supervisor's harassment, we held that the work-related stress must be caused by actual, and not merely perceived or imagined, employment events. In *Moonblatt v. Workmen's Compensation Appeal Board,* 85 Pa. Commonwealth Ct. 128, 481 A.2d 374 (1984), where an attorney claimed that the pressures of his work for the City of Philadelphia and the crowded work environment precipitated his mental collapse, we affirmed the board's denial of benefits, noting that the claimant had not presented sufficient evidence that his working conditions were abnormal, nor that his disability was anything but a subjective reaction to them.

However, in *Bevilacqua v. Workmen's Compensation Appeal Board,* 82 Pa. Commonwealth Ct. 511, 475 A.2d 959 (1984), we held that an employee who stepped into his father's job, thereby assuming new and greater work responsibilities, and thereafter underwent a mental deterioration, suffered a compensable

injury. The court distinguished *Thomas,* where nothing new or unusual occurred at the workplace around the time of the alleged mental injury. Therefore, under *Bevilacqua,* evidence of a significant change in job responsibilities was sufficient to establish that the claimant's working conditions are not "normal," and that the employment event precipitating stress is real, rather than merely perceived.

Similarly here, the records in both cases establish that the claimants' mental and emotional difficulties began when each accepted the new position as repair clerk at the Washington service center. In the DeMay case, the testimony of a co-worker and DeMay's supervisor corroborate DeMay's testimony regarding specific incidents when her supervisor publicly reprimanded her for poor job performance. However, the record in the Salsberry case contains no evidence of any specific incidents where Salsberry's supervisors publicly reprimanded, humiliated or harassed him, nor anything to substantiate that Salsberry's stress was caused by real, rather than imagined or perceived, harassment directed specifically toward him.

Salsberry's psychologist, Dr. Krivda, testified:

A. I am of the opinion that Mr. Salsberry's condition is indicative of a direct response to an acutely stressful working environment, resulting from pressure exerted by supervisors and perceived by him as being unrealistic and opressive [sic].

. . . .

Q. Now, you formed no conclusion that his supervisors are, in fact, unrealistic and oppressive; did you? Your conclusion was only that Mr. Salsberry felt that they were?

A. I have no [sic] seen the supervision.

Q. Right.

A. Therefore, I can't say; but if an employee of many years perceives it to be such, why then, there is the reason. That is reality for him.

Nevertheless, the records in both cases contain objective evidence in the form of Dr. Derogatis' study, accepted by each referee, which establishes that the service center had an extremely high stress environment and therefore did not embody normal working conditions. Therefore, these cases are distinguishable from *Hirschberg* and *Moonblatt* where there was no objective evidence that the employees' stress stemmed from actual, rather than imagined, employment events.

However, the record must also contain unequivocal medical testimony to establish the causal connection between the injury and employment. *Kitchen v. Workmen's Compensation Appeal Board,* 73 Pa. Commonwealth Ct. 289, 458 A.2d 631 (1983). The Salsberry record contains unequivocal medical testimony that the stress Salsberry was experiencing at work was the cause of his mental breakdown.[4]

However, our review of the DeMay record does not disclose medical evidence that is sufficiently unequivocal to uphold the referee's findings and conclusion in that case. We must conclude that medical

---

[4] Dr. Sidow, a psychiatrist, testified:

A. My diagnosis was that he underwent a psychotic depressive reaction.

Q. Do you have any opinion as to when this took place or why it took place?

A. I think it was precipitated—I think it peaked and began in March, the end of March of 1979, when he had the blackout spell at work.

Q. Do you have any opinion as to what caused the blackout spell at work?

A. My opinion is the stressful factors at work.

opinion which is prefaced with a caveat that it is "just speculation" fails to meet even the lenient standard of unequivocality set forth in *Philadelphia College of Osteopathic Medicine v. Workmen's Compensation Appeal Board,* 77 Pa. Commonwealth Ct. 202, 465 A.2d 132 (1983).[5]

Dr. Borerro testified on direct as follows:

Q. Doctor, do you have an opinion as to what in the environment causes this depression?

A. Well, looking into the background and the history that she provided, it seems logical to think that the depression started around the time that she felt tension was increasing in her job situation. She had not experienced this before.

. . . .

---

Dr. Adler, the family physician, testified:

Q. So you have developed an opinion as to whether his inside position at Bell, which he occupied in March of '79, had a causative relationship with his psychological problems?

A. Yes. I felt very definitely that it did.

[5] In *Philadelphia College of Osteopathic Medicine v. Workmen's Compensation Appeal Board (Lucas),* 77 Pa. Commonwealth Ct. 202, 206-07, 465 A.2d 132, 134-35 (1983), this court stated:

Certainly it is not the law, as it has been sometimes argued, that every utterance which escapes the lips of a medical witness on a medical subject, must be certain, positive, and without reservation, exception, or peradventure of a doubt. We repeat, that as to facts which a claimant must prove by medical evidence, it is sufficient that his medical expert, after providing a foundation, testify that in his professional opinion or that he believes or that he thinks the facts exist. The claimant has, in such event, produced competent evidence of the facts which, if accepted by the factfinder will support an award, even if the medical witness admits to uncertainty, reservation, doubt or lack of information with respect to medical and scientific details; so long as the witness does not recant the opinion or belief first expressed.

Q. Do you know of any factors, any environmental factors other than her work which may have caused the acute anxiety and the depression?

A. I would say that that was probably the primary pressure. I think she had also made comments about developmental issues in her family related to children moving away, the so-called empty nest syndrome, that may have ployed a role, but based on the information provided by her and our own observations, it seems as if it were more related to the job at that particular time.

Now, I want to say that I am not totally sure if this particular stress had been there before and she was able to cope or not before. If the stress was there before and she was able to cope, it may be an indication that her coping abilities had decreased considerably at that particular time and she became dysfunctional.

What can make an individual lose coping abilities is certainly a matter of speculation.

. . . .

So as I said, I am just speculating at this point. It's difficult to say specifically if these played a role or not. The only thing that I can say is that there is a strong association between symptom formation and the stress in this particular job.

. . . .

Q. Doctor, you said you were speculating as to the reasons for this depression and anxiety. Speculating as far as other factors are concerned or speculating as far as work is concerned?

A. About all the factors that are concerned,

Although factually similar, this case is distinguishable from *McDonough,* where the medical expert acknowledged the "possibility" that factors outside of the claimant's work may have contributed to his mental illness, but did not characterize his opinion as speculation, as here.

Accordingly, we reverse the order of the board in the DeMay case, and affirm the order of the board in the Salsberry case.

### Order in 2131 C.D. 1983

Now, February 14, 1985, the order of the Workmen's Compensation Appeal Board at No. A-82482, dated July 14, 1983, is reversed.

### Order in 2037 C.D. 1983

Now, February 14, 1985, the order of the Workmen's Compensation Appeal Board at No. A-82533, dated June 30, 1983, is affirmed.

This decision was reached prior to the resignation of Judge WILLIAMS, JR.

---

CONCURRING AND DISSENTING OPINION BY JUDGE DOYLE:

I concur with the majority's result which is to deny benefits to Claimant DeMay. I must, however, dissent from that portion of the opinion which affirms the award of benefits to Claimant Salsberry. The majority's analysis is without fault regarding the medical evidence, and I readily agree that the medical evidence is equivocal with respect to Claimant DeMay and unequivocal with respect to Claimant Salsberry. I am of the view, however, that it is unnecessary to reach this issue.

In order to demonstrate a compensable injury in a psychological injury case a claimant must prove,

*inter alia,* an unusual work related occurrence at or near the time of the alleged injury. *Bevilacqua v. Workmen's Compensation Appeal Board (J. Bevilacqua Sons, Inc.),* 82 Pa. Commonwealth Ct. 511, 515, 475 A.2d 959, 961 (1984) (distinguishing *Thomas v. Workmen's Compensation Appeal Board,* 55 Pa. Commonwealth Ct. 449, 423 A.2d 784 (1980)). In *Thomas* we held that a claimant's subjective reaction to *normal working conditions* is not a compensable injury under The Pennsylvania Workmen's Compensation Act. *Id.* at 456, 423 A.2d at 788; *see also Moonblatt v. Workmen's Compensation Appeal Board (City of Philadelphia),* 85 Pa. Commonwealth Ct. 128, 130, 481 A.2d 374, 375 (1984).

The majority writes, "the records in both cases contain objective evidence in the form of Dr. Derogatis' study, accepted by each referee, which establishes that the service center had an extremely high stress environment and therefore did not embody normal working conditions." The referee did indeed find that a high stress work environment existed, but he made *no* specific findings that this was *abnormal* for the type of job claimants were performing, nor did the referee make any findings as to whether an unusual employment event occurred which caused the high stress work environment. Because I believe that a finding that at least one of these two criteria existed is necessary I would remand the case.

By holding that a high stress work environment is, and of itself, a sufficient work related abnormality, the majority creates a dangerous precedent. Many types of jobs are, by their very nature, high stress. Such occupations as that of an air traffic controller, a school teacher in a ghetto area, or a police officer, for example, may well be viewed as high stress; but for these particular positions *high stress is normal.*

Thus, while I acknowledge that the referee determined that the service center had a "disproportionate amount of psychiatric casualties" in finding of fact number five in the Salsberry appeal, I am not convinced that such a finding standing alone demonstrates an abnormal working condition as a matter of law. This Court has already recognized the highly subjective nature of psychological injuries; *Bevilacqua*, 82 Pa. Commonwealth Ct. 511, 475 A.2d at 961; *Hirschberg v. Workmen's Compensation Appeal Board (Department of Transportation)*, 81 Pa. Commonwealth Ct. 579, 583, 474 A.2d 82, 84 (1984); *Thomas*, 55 Pa. Commonwealth Ct. at 459, 423 A.2d at 789. We have therefore required that in such claims the injuries' occurrences and causes be clearly delineated. This reasoning is sound and in my view should be adopted to require specificity in the referee's findings with respect to what makes a high stress work environment an abnormal working condition.

It is my view that for a high stress working environment to constitute a legally sufficient abnormal working condition there must be a finding either that claimant's work performance (as distinguished from the mere job description) was unusually stressful *for that kind of a job* or a finding that an unusual event occurred making the job more stressful than it had been. There is evidence of record here that a significant change in supervisory personnel had taken place and that subsequent to this change, employees began exhibiting psychological disorders. But, this Court can not determine the credibility or authenticity of that evidence.

Because it is my view that with respect to Claimant Salsberry the referee's findings are insufficient to establish whether there was an abnormal working condition, I would remand his case and hence would

not reach the issue of whether the medical evidence is sufficient as a matter of law.

I concur rather than dissent with respect to Claimant DeMay because I believe the majority has demonstrated that even if the case were remanded for findings on whether the high stress environment was an abnormal working condition, Claimant DeMay would still be precluded from recovering because she has failed to present the unequivocal medical testimony which is required in these cases.